```
                    UNITED STATES DISTRICT COURT
                       DISTRICT OF NEW JERSEY

JOHN FINKE,                         :   Civil A. No. 08-4683(NLH)(JS)
and SUSAN FINKE,                    :
        Plaintiffs,                 :
                                    :
     v.                             :   OPINION
                                    :
BORGATA HOTEL, CASINO & SPA,        :
MARINA DISTRICT DEVELOPMENT         :
COMPANY, LLC, and                   :
JAMES LAFORTE, JR.,                 :
        Defendants.                 :

MARINA DISTRICT DEVELOPMENT         :
COMPANY, LLC,                       :
        Third-Party Plaintiff       :
                                    :
     v.                             :
                                    :
JAMES LAFORTE, JR.,                 :
        Third-Party Defendant.      :
```

**APPEARANCES:**

KENNETH G. ANDRES, JR.
MICHAEL S. BERGER
ANDRES & BERGER, P.C.
264 KINGS HIGHWAY EAST
HADDONFIELD, NJ 08033

   On behalf of plaintiffs

RUSSELL L. LICHTENSTEIN
GEORGE C. GODFREY III
COOPER, LEVENSON, APRIL, NIEDELMAN & WAGENHEIM, PA
1125 ATLANTIC AVENUE
THIRD FLOOR
ATLANTIC CITY, NJ 08401-4891

       On behalf of defendant/third-party plaintiff Marina District
       Development Company, LLC d/b/a Borgata Hotel, Casino & Spa

**HILLMAN**, District Judge

       Presently before the Court is defendant's motion for summary

judgment on plaintiffs' claims concerning an assault that

occurred on defendant's premises.  Within defendant's motion for summary judgment is its request to bar the testimony of plaintiffs' security expert.  For the reasons expressed below, defendant's summary judgment motion will be denied, and its request to bar plaintiffs' expert is also denied.

## BACKGROUND

On September 23, 2006 at approximately 3:00am, plaintiff John Finke was in the port cochere, or valet, area of the Borgata Hotel and Casino waiting to leave the casino.  Finke had patronized the casino that evening with Daniel Gordon, Finke's future son-in-law, and Daniel's brothers, Kevin and Stephen.  Finke, Daniel, and Kevin exited the building, but Kevin immediately re-entered to purchase beer.  Upon their exit, Finke and Daniel noticed about thirty non-employees "milling about," and five to seven people acting "unruly" in front of the casino doors.  Daniel observed that this group was screaming and yelling, with one of them punching a taxi sign, knocking it down.  Daniel also observed that the group was heckling other patrons, attempting to draw people into a fight.

After about three to five minutes, Daniel was drawn into the altercation.  Daniel states that the group was "mouthing off" and "swearing" at him.  At that time, Kevin exited the building and came into the valet area carrying an ice bucket full of beer bottles he had purchased inside.  The exchange between the

2

"hecklers" and Daniel escalated, and Kevin was drawn into the exchange.

Stephen then exited the building, and attempted to get between Kevin and one of the hecklers, pushing Kevin back, telling him it was not "worth it." Daniel observed that another heckler came from behind Stephen, and smashed an object into Kevin's face, splitting his nose open. The group of hecklers started to retreat around potted planters, and Daniel retrieved a glass from another planter and threw it in the direction of the hecklers. It smashed on the ground, not hitting anyone. Two hecklers ran away, and another one ran by Finke, striking him on the head as he ran past.[1] Finke suffered serious and permanent damage to his brain, head and scalp with permanent deficits of memory, behavior, emotions and cognitive functioning capacity.

Finke claims that the Borgata is liable for his injuries because it was negligent in its duty of care to protect him, a business invitee, from a known dangerous condition.[2] The Gordons state that from the time they first exited the building into the valet area until Kevin was punched in the face, six to eight

---

[1] The Borgata has filed a third-party complaint against James LaForte, Jr., claiming that LaForte was the individual who struck Finke, and that if the Borgata is found liable to Finke, LaForte is wholly or partially liable for that judgment. On April 27, 2010, the Clerk entered default as to LaForte.

[2] Finke's wife, Susan Finke, is also named as a plaintiff, and she has asserted a separate claim for damages for loss of consortium due to her husband's injuries. (Compl. Count 13.)

minutes elapsed, and another two minutes passed before Finke was hit on the head. Also during this entire time, three Borgata valets were present, and personal vehicles and taxis were coming in and out of the valet area. The Gordons state that no security personnel were present, or dispatched to the area, until after Kevin was hit, and even at that time, only one person from security came to the area. That security person, a Borgata Crowd Control Specialist, Leo Staub, had been securing parking for a tour bus in another part of the valet area, along with Kathleen Wagner, a Borgata entertainment department employee, and a bellman, when a bottle from the heckler's altercation hit the tour bus. According to the Gordons, it was not until the bottle hit the tour bus, and after Kevin was punched in the nose, that Staub focused his attention to the melee. In his complaint, Finke claims that Borgata's lack of security in the valet area at that time of night proximately caused his injuries because the Borgata knew of the dangers of that area from past incidents, and with regard to this particular incident, the Borgata was aware of six to eight minutes of disruptive behavior that it negligently left unremediated.

The Borgata has filed a motion for summary judgment, arguing that Finke's claims fail because it did not owe Finke the duty he claims, and even if it did, it did not breach that duty. The Borgata has also moved to strike the opinion of Finke's security

4

expert, arguing that the expert does not meet the standards set forth by Daubert v. Merrell Dow Pharma., 509 U.S. 579 (1993). Finke has opposed both motions.

## DISCUSSION

**A.   Jurisdiction**

This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000.

**B.   Summary Judgment Standard**

Summary judgment is appropriate where the Court is satisfied that "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 330 (1986); Fed. R. Civ. P. 56(c).

An issue is "genuine" if it is supported by evidence such that a reasonable jury could return a verdict in the nonmoving party's favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A fact is "material" if, under the governing substantive law, a dispute about the fact might affect the outcome of the suit.  Id.  In considering a motion for summary judgment, a district court may not make credibility

5

determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence "is to be believed and all justifiable inferences are to be drawn in his favor." Marino v. Industrial Crating Co., 358 F.3d 241, 247 (3d Cir. 2004)(quoting Anderson, 477 U.S. at 255).

Initially, the moving party has the burden of demonstrating the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the moving party has met this burden, the nonmoving party must identify, by affidavits or otherwise, specific facts showing that there is a genuine issue for trial. Id. Thus, to withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict those offered by the moving party. Anderson, 477 U.S. at 256-57. A party opposing summary judgment must do more than just rest upon mere allegations, general denials, or vague statements. Saldana v. Kmart Corp., 260 F.3d 228, 232 (3d Cir. 2001).

**C.   Analysis**

   1. ***Defendant's motion for summary judgment on plaintiffs' premises liability claim***

The law on premises liability for business invitees has been long-established. "Business owners owe to invitees a duty of reasonable or due care to provide a safe environment for doing that which is within the scope of the invitation," and that duty of care "requires a business owner to discover and eliminate

6

dangerous conditions, to maintain the premises in safe condition, and to avoid creating conditions that would render the premises unsafe." Nisivoccia v. Glass Gardens, Inc., 818 A.2d 314, 316 (N.J. 2003) (citations omitted).

This standard usually applies in circumstances where a patron is injured by an unsafe condition of the actual physical premises, such as water or food on the floor.  This case, involving claims by a patron that the lack of proper security measures created a known dangerous condition resulting his injuries, puts the premises liability standard in a different context, which this Court recently addressed in Lanigan v. Marina Dist. Development Co., LLC, Civ. A. No. 08-5201, 2011 WL 1211320 (D.N.J. March 28, 2011) (NLH/JS).  As explained in Lanigan, in order to make out a *prima facie* case of premises liability, a plaintiff is required to show either (1) that defendant knew of the unsafe condition for a period of time prior to plaintiff's injury sufficient to permit defendant in the exercise of reasonable care to have corrected it; or (2) that the condition had existed for a sufficient length of time prior to plaintiff's injury that in the exercise of reasonable care defendant should have discovered its existence and corrected it.  Lanigan, 2011 WL 1211320 at *2 (citing Collier v. Borgata, 2009 WL 2707359, *5 (N.J. Super. App. Div. 2009) (citing Parks v. Rogers, 176 N.J. 491, 498 n.3 (2003) (other citations omitted)).

7

As also explained in <u>Lanigan</u>, New Jersey law has developed an additional standard, born out of equitable considerations, that does not require a plaintiff to prove notice:

> A plaintiff is relieved of proving notice "in circumstances in which, as a matter of probability, a dangerous condition is likely to occur as the result of the nature of the business, the property's condition, or a demonstrable pattern of conduct or incidents." <u>Nisivoccia v. Glass Gardens, Inc.</u>, 818 A.2d 314, 316 (N.J. 2003). This "mode-of-operation" rule, which has been incorporated into New Jersey's Model Jury Instructions, states "that when a substantial risk of injury is inherent in a business operator's method of doing business, the plaintiff is relieved of showing actual or constructive notice of the dangerous condition." <u>Id.</u> Accordingly, a plaintiff is entitled to an inference of negligence, and the burden of production is shifted to the defendant, who may avoid liability if it shows that it did "all that a reasonably prudent man would do in the light of the risk of injury [the] operation entailed." <u>Id.</u> (citing <u>Wollerman v. Grand Union Stores, Inc.</u>, 221 A.2d 513 (N.J. 1966)). Thus, "[a]bsent an explanation by defendants, a jury could find from the condition of the premises and the nature of the business that defendants did not exercise due care in operating the [establishment], and that said negligent operation was the proximate cause of [the] injuries." <u>Id.</u> (citations omitted). Of course, even under this standard, the ultimate burden of persuasion remains with the plaintiff. <u>See id.</u>

<u>Id.</u>

Because the <u>Lanigan</u> case also involves premise liability claims based on a patron's assault at the Borgata, its facts are instructive. In <u>Lanigan</u>, the plaintiff entered the elevator at the Borgata at 2:00am to go to his room. When he boarded the elevator, four men were already on it. Plaintiff engaged the men in a friendly conversation regarding the upcoming football game

8

between the Philadelphia Eagles and New York Giants.  When the elevator reached the plaintiff's floor the man behind plaintiff suddenly wrapped one of his arms around the plaintiff's neck and twisted him to the left side of the elevator.  The man twisted plaintiff out of the elevator, followed by the three other men.  The plaintiff claimed that he was plunged into a statue and then choked, punched, and kicked by all four men.  The four men then ran down the hallway, and were never identified or apprehended.  Id. at *1.

In deciding the Borgata's motion for summary judgment, this Court found that the plaintiff's premises liability claim was not sustainable.  The Court determined that twelve prior incidents in Borgata guest room hallways, "unrelated in nature, cannot serve to provide defendant with notice that, in an elevator accessed only by registered guests, four men, who had been engaging in an innocuous conversation about football with Mr. Lanigan, would suddenly attack him in the hallway when the elevator stopped at the floor of Mr. Lanigan's guestroom."  Id. at *4.  The Court also rejected that the high crime rate of Atlantic City in general served to put the Borgata on notice of a dangerous condition.  Id.

With regard to the plaintiff's claims that the Borgata's mode-of-operation created the dangerous condition that caused his injuries, this Court found:

Prior to this incident there was no indication that

9

> these men had been acting inappropriately in the casino, harassing other guests, or otherwise raising suspicion. Thus, prior to the assault, there was nothing about these particular men that would have caused defendant to have a duty to protect Mr. Lanigan from them. As to how defendant conducted its business—i.e., how defendant provided security to its guests—it is too speculative to determine whether conspicuously posted signs alerting guests to the presence of active video surveillance would have deterred these men from attacking Mr. Lanigan. It is also too speculative to predict how the men would have acted if a security guard happened to be on the 25th floor in front of the elevators when Mr. Lanigan was man-handled out of it. Short of having a security guard in the elevator and security guards stationed at intervals on each guest floor, unfortunately there was nothing defendant could do to prevent the situation Mr. Lanigan found himself in.

Id. at *5. Accordingly, the Court ultimately concluded that "[e]ven considering plaintiffs' vigorous argument that defendant should have employed more stringent security measures in the hotel's guestroom floors, plaintiffs have not met their burden of establishing a disputed issue of fact regarding defendant's actual or constructive knowledge of the dangerous condition, or its creation of the dangerous condition." Id. at *6.

The case here is different from Lanigan. Finke has provided evidence that for approximately six to eight minutes prior to his attack, a group of "hecklers" were taunting others in the valet area, with their conduct becoming more unruly and violent as they engaged the Gordons and other patrons. Finke has also presented evidence that during this time period, although several Borgata valet and other employees were present, none of them alerted

10

Borgata security as to the escalating situation, and no security personnel came into the valet area to temper the ruckus.  The only person from security in the area during this time was focused on assisting a band's tour bus, and he did not acknowledge the disturbance until Kevin Gordon was hit in the face.  Even though the Borgata security employee, Leo Staub,[3] then called surveillance for coverage, advised them about the fight, and attempted to begin to control the situation by detaining the man who hit Kevin, it was immediately after Kevin was hit that one of the other hecklers ran by Finke and struck him on the head.  Tellingly, the surveillance video only begins recording a few seconds before Finke is struck.

    The Borgata argues that it cannot be held liable for Finke's injuries because it did not breach any duty to him.  The Borgata argues that although it has a duty to exercise care to protect its patrons, Finke being hit was as surprising and sudden to the Borgata as it was to him.  Because Finke's assault happened so quickly, the Borgata argues that it had no way of knowing it was going to occur, and it had no way to prevent it from occurring.

    The Borgata's argument is undermined by Finke's evidence regarding the six to eight minutes of the escalating disturbance.

---

[3]Leo Staub has not been deposed in this matter.  Plaintiffs have provided Staub's "Associate Voluntary Statement" he wrote for the Borgata about the incident.  (Pl. Ex. F at 24.)

11

If the accounts of Finke and the Gordons are credited, as the Court must do in deciding a defendant's summary judgment motion, a jury could find that the Borgata knew--or should have known--of the unsafe condition for a period of time prior to Finke's injury sufficient to permit the Borgata to have corrected it.  Unlike the sudden attack on the plaintiff in Lanigan where there had been no previous indication the fellow elevator passengers would act violently toward the plaintiff, in this case, six to eight minutes of taunting, yelling, and disruptive behavior in a common valet area populated by dozens of other patrons and Borgata staff preluded Finke's attack.  The attack on Finke was sudden and unexpected when considering he was simply a bystander not involved in the fray, but a jury could believe that it was not sudden or unexpected in the context of an unremediated, eight-minute-long, increasingly violent and unruly disturbance.

Moreover, with regard to Borgata's argument that even if it breached a duty of care to Finke, it is not the proximate cause of his injuries, that argument is without merit if a jury does not find that the Borgata did all it reasonably could have done in that situation.  See Nisivoccia v. Glass Gardens, Inc., 818 A.2d 314, 316 (N.J. 2003) ("Absent an explanation by defendants, a jury could find from the condition of the premises and the nature of the business that defendants did not exercise due care in operating the [establishment], and that said negligent operation

12

was the proximate cause of [the] injuries."); Zepf v. Hilton Hotel & Casino, 786 A.2d 154, 161 (N.J. Super. Ct. App. Div. 2001) (discussing Clohesy v. Food Circus Supermarkets, Inc., 694 A.2d 1017 (1997)) (explaining that because a business owner has a duty to protect its patrons from foreseeable criminal acts which occur on its property, it has a duty to provide security--what kind of security, however, is "determined on a case-by-case basis, applying the totality of the circumstances standard").[4]

Consequently, Finke has provided sufficient evidence to defeat defendant's summary judgment motion and to have a jury decide whether the Borgata is liable for Finke's injuries. See Butler v. Acme Markets, Inc., 445 A.2d 1141, 1146 (N.J. 1982) (explaining that is for a jury to determine if a business establishment has exercised reasonable care in the performance of its duty to safeguard its business invitees from the criminal acts

---

[4]It appears that through their expert, plaintiffs seek to also prove a mode-of-operation premises liability claim because the expert considered that in the 23 days prior to Finke's assault, two assaults, two sexual assaults, one physical altercation, thirteen arrests and several formal evictions stemming from assaults, as well as numerous incidents requiring security to respond to the valet area, occurred at the Borgata. (Pl. Br. at 32, citing to Ex. I.)  Plaintiffs' expert also considered the reports of assaults, totaling 241 incidents of varying degrees, that occurred at the Borgata in the three years prior to Finke's assault. (Id.)  Whether the expert is permitted to testify as to his opinion that these statistics caused the Borgata to act unreasonably in not providing sufficient security in the valet area at the time of Finke's assault is an issue addressed below.  These statistics, however, independent of any interpretation by an expert, show that plaintiffs have provided sufficient proof to send the mode-of-operation claim to a jury.

13

of third persons).[5]

2.  *Defendant's request to bar plaintiffs' expert witness*

In addition to its motion for summary judgment, the Borgata has moved to bar the testimony of plaintiffs' expert witness. Plaintiffs retained Norman D. Bates, Esquire, as their security expert. He reviewed all discovery in the case, and provided his opinion regarding the Borgata's security measures. Mr. Bates concluded, among other things, that the Borgata was aware of previous violence in the valet area, that the Borgata failed to provide proper security on the night Finke was injured, and that the Borgata's inadequate security caused Finke's injuries.

The Borgata seeks to bar Mr. Bates' testimony, arguing that it does not meet the requirements of Federal Rule of Evidence 702[6]

---

[5] It does not appear that the Borgata disputes Finke's and the Gordon's account of the incident. Thus, although it does not appear that disputed issues of fact as to the incident remain in the case to be determined by a jury, a jury must still decide whether the Borgata acted reasonably in its duty to protect its patrons.

[6] Rule 702 provides,

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

or the standard under Daubert v. Merrell Dow Pharma., 509 U.S. 579 (1993),[7] because his opinions: "totally disregard the portion of the video tape which shows a Borgata Security Employee talking to Mr. LaForte just before the incident occurs.  He saw/heard an altercation and came over and separated the two groups.  After observing a bottle being thrown, he directed his attention and within seconds, plaintiff was struck."  (Def. Br. at 6.)  Based solely on this alleged failing of plaintiffs' expert, defendant seeks to strike his testimony.

The Borgata's motion must be denied at this time.  Through its request in its summary judgment motion, defendant has essentially presented a motion in limine to restrict plaintiffs'

---

[7] In Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 572 (1993), the Supreme Court analyzed Rule 702, and instructed that a two-step analysis is to be used to assess the admissibility of the proffered expert testimony on scientific issues under Rule 702.  The expert testimony must be reliable, so that it must be "scientific," meaning grounded in the methods and procedures of science, and it must constitute "knowledge," meaning something more than subjective belief or unsupported speculation.  Daubert, 509 U.S. at 590. Guideposts that the court may consider in assessing the reliability of the proffered expert testimony include, but are not limited to: (1) whether the expert's methodology has been tested or is capable of being tested; (2) whether the technique has been subjected to peer review and publication; (3) the known and potential error rate of the methodology; and (4) whether the technique has been generally accepted in the proper scientific community.  Id. at 593-94; In re TMI Litig., 193 F.3d 613, 663-64 (3d Cir. 1999).  Ultimately, a court is required to act as a gatekeeper "to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the practice of an expert in the relevant field."  Kumho Tire Co. v. Carmichael, 526 U.S. 137, 152 (1999).

15

evidence at trial. Although such a motion is somewhat premature when presented in conjunction with a summary judgment motion, even if the Court were to consider it now, defendant's argument does not show how Mr. Bates or his opinion fail under Rule 702 or Daubert.

The purpose of Rule 702 and Daubert is to ensure that the expert is sufficiently qualified, his opinion is based on sufficient facts, and his testimony is based on reliable methods. Plaintiffs have shown that Mr. Bates reviewed the video tape in making his opinion, and have set forth Mr. Bates' qualifications, all the other facts and evidence he considered, and how he came to his conclusions. (Pl. Ex. L and J.) Defendant's conclusory disagreement that Mr. Bates did not review the video tape does not cast doubt on Mr. Bates' standing as an expert witness.[8]

Furthermore, if instead of presenting a type of motion in limine, defendant has meant to argue that the bar of Mr. Bates' testimony would be substantively fatal to plaintiffs' claims, such an argument is also without merit. As noted by plaintiffs, expert testimony is not required to prove their claims. Butler v. Acme Markets, Inc., 445 A.2d 1141, 1147 (N.J. 1982) ("As to the absence of expert testimony [in this premises liability case], except for

---

[8]Plaintiffs represent that defendant has not deposed Mr. Bates, and defendant has not served its own expert report onto plaintiffs.

malpractice cases, there is no general rule or policy requiring expert testimony as to the standard of care. . . .  The test of need of expert testimony is whether the matter to be dealt with is so esoteric that jurors of common judgment and experience cannot form a valid judgment as to whether the conduct of the party was reasonable."). Even though "such testimony would be an aid to a jury and its use is encouraged in future cases," "its absence is not fatal" to a premises liability claim.  Id.  Thus, even if the Court were to preclude the testimony of plaintiffs' expert witness at trial, it would not serve as a basis to grant defendant's summary judgment motion.

Consequently, defendant's request to bar plaintiffs' expert must be denied.  This denial, however, is without prejudice to defendant's right to bring a properly supported motion in limine to bar Mr. Bates' testimony at the appropriate time in anticipation of trial.

## CONCLUSION

For the reasons expressed above, defendant's motion for summary judgment on plaintiffs' claims against it, and defendant's request to bar plaintiffs' expert, are denied.  An appropriate Order will be entered.

Date: June 17, 2011                    s/ Noel L. Hillman

At Camden, New Jersey              NOEL L. HILLMAN, U.S.D.J.